```
                       UNITED STATES DISTRICT COURT
                         DISTRICT OF CONNECTICUT

------------------------------------x
                                    :
D. BRIAN RADECKI,                   :
                                    :
          Plaintiff,                :
                                    :
v.                                  : Civil No. 3:06cv00849(AWT)
                                    :
GLAXOSMITHKLINE                     :
                                    :
          Defendant.                :
                                    :
------------------------------------x
```

**<u>RULING ON MOTION TO DISMISS WITH PREJUDICE AND FOR COSTS AND FEES</u>**

The defendant has moved for a sanction in the form of dismissal with prejudice of the plaintiff's claims in this action or, in the alternative, for an award of costs and fees associated with the mistrial declared in this action and the instant motion. For the reasons set forth below, the court is dismissing the plaintiff's case with prejudice.

**I.   STATEMENT OF FACTS**

Plaintiff D. Brian Radecki ("Radecki") commenced employment with defendant GlaxoSmithKline ("GSK") on February 5, 2001 as a pharmaceutical sales representative. Radecki injured his knee in May 2004 and went on leave from May 25 to July 29, 2004 under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 <u>et</u> <u>seq.</u>. He subsequently took a second medical leave from August 13 to August 31, 2004 and a third medical leave from February 18 to May 27, 2005, both relating to the same knee injury. On June 7, 2005, GSK terminated his employment.

Radecki filed this action, claiming that GSK terminated his employment in retaliation for him exercising his rights under the FMLA, terminated his employment in retaliation for him engaging in protected speech, in violation of Connecticut General Statutes § 31-51q, and terminated his employment in violation of public policy.  GSK contends that it terminated Radecki's employment only after a compliance investigation revealed that the plaintiff had, on at least ten different occasions, falsified company records regarding his call reporting activities, and then only after allowing him to take advantage of FMLA leave it had approved.  The court granted summary judgment in favor of GSK on the second claim, and the case proceeded to trial on the FMLA retaliation and wrongful termination in violation of public policy claims.

Because Radecki had only worked for a relatively short period during the almost four years since GSK terminated his employment, one of the issues at trial was whether he had mitigated damages.  During his direct examination on May 7, 2009, Radecki's attorney asked him about his efforts to find work after the date on which GSK terminated his employment.  The pertinent testimony is as follows:

>     Q: Did there ever come a time that you stopped looking
>        for work?
>     A: Yes.
>     Q: When?
>     A: In November of last year.
>     Q: Why?

>     A: Because of the last week of October I learned that I
>     had -- have stage III prostate cancer with a metastatic
>     brain lesion.
>     Q. How long did that -- did you get treatment for that?
>     A. Yes.
>     Q. When was that concluded?
>     A. Well, the major -- the major conclusion was I had
>     surgery in January.
>     Q. Did you resume your job search after that?
>     A. I have at least on paper.  I'm still in
>     rehabilitative mode.

(Trial Tr. Vol. I, 152, May 7, 2009.)  The plaintiff's counsel had not known anything about "a metastatic brain lesion" until his testimony was given.

After the jury had been excused for the day, defense counsel expressed a concern that "Radecki's Stage III metastatic cancer was not disclosed" to the defense, notwithstanding the pertinent interrogatory and production request that had been propounded by the defendant, and stated that had it been disclosed, the defense, would have moved in limine with respect to that evidence.  Id. at 193.  The plaintiff's counsel stated in response that a document provided a week earlier, i.e., a copy of Radecki's request for an extension for paying his taxes for 2008, which admittedly was not responsive to the pertinent interrogatory and production request, contained a statement that Radecki had undergone cancer treatment.  The court did not address that issue but, rather, observed that had a motion in limine been filed, it would have been granted and that the plaintiff would have been allowed only to make a general

reference to health problems.  The court and counsel agreed to consider the matter overnight and discuss it further the next morning.

   The next morning, the defense informed the court that it was moving for a mistrial.  In support of its motion for a mistrial, the defense argued first that "[t]he assumption . . . that juries will follow limiting and curative instructions does not apply when prejudice is so severe that the instructions would be ineffective."  (Trial Tr. Vol. II, 199, May 8, 2009) (citing United States v. Hamdy, No. 05-CR-232S, 2006 U.S. Dist. LEXIS 44043, at *6 (W.D.N.Y. June 28, 2006) (citation and internal quotation marks omitted)).  The defense contended that the prejudice was so severe here so as to render a curative instruction ineffective because, based on Radecki's statement that he had stage III prostate cancer with a metastatic brain lesion, the jury could reasonably infer that Radecki was dying.  The court agreed that such an inference would be a reasonable one.  In addition, the defense pointed to a concern that when Radecki was asked if he was looking for a job after his surgery, he said "on paper," and whereas the defense would ordinarily confront a witness who gave such a response about his effort to mitigate damages, if the defense sought to confront the plaintiff on that point, it would simply remind the jury about his cancer.  At the point the motion for a mistrial was made, the defense

proceeded with the understanding that Radecki had a metastatic brain lesion, as did Radecki's counsel and the court. The court and counsel discussed various options as to how to proceed. The court eventually decided to require the plaintiff to obtain and deliver to the defense all his medical records, and also decided to meet with counsel later that day after defense counsel had an opportunity to review the medical records. After the parties were informed that the plaintiff would be required to turn over his medical records, Radecki had a private conversation with his counsel, immediately after which his counsel stated:

> I just want to clarify one other issue, I don't know if we need to go any further with it. With respect to the illness and the treatment itself, he had the surgery and the postoperative course. Right now apparently he's clear. The brain issue is not an issue--what showed up on the imaging had not progressed, didn't warrant treatment. I wanted you to understand. You mentioned the issue that they could be concerned that he might be [dying], we could actually resolve that if you want to. He's apparently clear now.

(Trial Tr. Vol. II, 213, May 8, 2009.) The jury was excused for the day, and a recess followed.

On the afternoon of May 8, the court continued the hearing after the defense had had an opportunity to review the plaintiff's medical records. Radecki's medical records reflect that he was given a whole body bone scan on October 2, 2008. The doctor noted a small non-specific abnormality in the right frontal skull and observed that the mild intensity and small size suggested that it was benign. However, the doctor stated that a

small metastatic lesion at the site could not be entirely ruled out.  Correlation with an MRI was recommended for follow up.  The report concludes that all other abnormalities were not strongly suspicious for metastatic disease.  On October 24, 2008, Radecki was seen by another physician who wrote in his report that he had reviewed Radecki's bone scan and CT scan report and had spoken with the doctor who read the bone scan.  The October 24, 2008 report notes that Radecki would be getting an MRI of his head in the near future.  It also states that the lesion is not concerning for the doctor from a metastatic perspective but the doctor would wish to rule out other etiology of this finding.  Also, it states that the patient is in agreement.  Finally, on October 31, 2008, Radecki had a cranial MRI.  The report of the examination states that the MRI scan of the brain revealed no evidence of a mass lesion and that there was no evidence of metastatic disease to the brain.

   After receiving a report on the contents of Radecki's medical records, the court informed the parties that if it could craft an appropriate curative instruction, it would canvas the members of the jury to determine whether each juror could follow the instruction and would excuse any juror the court concluded would not be able to do so.  After further discussion with counsel, however, the court concluded that it could not craft an appropriate curative instruction.  A curative instruction that

merely told the jurors not to consider the plaintiff's prostate cancer would have left the defendant in a position where it would be unfairly limited in cross-examination on the issue of mitigation of damages.  In addition, in order to be not misleading, any curative instruction would have had to address the plaintiff's testimony concerning a metastatic brain lesion, and would have made it clear that the plaintiff never had a metastatic brain lesion.  The court concluded that an instruction conveying that information would be extremely prejudicial to the plaintiff because it would be, in substance, a negative commentary by the court on the plaintiff's credibility.  This commentary would have been particularly significant in this case, where the defendant's contention is that the plaintiff was fired because he falsified records regarding his call reporting activities.  Consequently, the court concluded that an appropriate curative instruction could not be given under the circumstances and declared a mistrial.

During the discussion that afternoon, the defense had informed the court that it wanted an opportunity to file a motion to dismiss with prejudice.  The defense was permitted to conduct discovery to prepare for that motion and/or a new trial, and Radecki was re-deposed on June 19, 2009.  Radecki was asked about the meeting with his doctor, which occurred on October 24, 2008.  Radecki testified as follows:

```
Q.  When you walked out of the door, what was your
understanding-- when you walked out of that meeting
. . ., what was your understanding of your health
condition at that time?
A.  That I definitely had prostate cancer and probably
had a brain tumor.
Q.  Did you later learn that that wasn't -- that you did
not have the brain tumor?
A.  Yes, when I sat in my car on the 6th of November and
opened this up.
```

(Radecki Dep. 550:6-15, June 19, 2009.)  Thus, Radecki concedes that by November 6, 2008, he knew that he did not have a metastatic brain lesion.

## II.  DISCUSSION

After considering Radecki's testimony on May 7, 2009 and the other relevant evidence, the court concludes, on the basis of clear and convincing evidence, that he committed perjury and that a sanction is appropriate.  After considering the possible sanctions available, the court concludes that a sanction of dismissal with prejudice is most appropriate, under the circumstances of this case, in view of the fact that Radecki committed perjury in a formal proceeding.

### A.   Perjury

Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  U.S. v. Dunnigan, 507 U.S. 87, 94 (1993).

Radecki gave false testimony when he stated "I had -- have stage III prostate cancer with a metastatic brain lesion."

-8-

(Trial Tr. Vol. I, 152, May 7, 2009.)  At no time did Radecki have a metastatic brain lesion.  Thus, his testimony was false when he testified on May 7, 2009 that in the past, he had been afflicted with a metastatic brain lesion, and it was also false when he testified that on May 7, 2009 he was then afflicted with a metastatic brain lesion.

The false testimony concerned a material matter.  Mitigation of damages was a material issue in the trial because Radecki had worked for a very limited period of time after GSK terminated his employment, and the testimony was offered as part of his reason for failing to obtain a new job.  The false testimony was also material in the context of the entire case because it had to cause the members of the jury to feel a great deal of sympathy for him.  As the court observed on the morning of May 8:

> [H]aving heard the statement from Mr. Radecki yesterday myself, I can tell you that I think everybody in the courtroom naturally felt a great deal of sympathy for him.  It's only human and it's quite natural and appropriate.

(Trial Tr. Vol. II, 204, May 8, 2009.)  Defense counsel accurately described the effect of Radecki's testimony when he stated that "the metastasis with brain involvement, brain lesion, took the air out of the courtroom."  (Tr. of Oral Argument at 20, July 27, 2009.)  Although the plaintiff argued that once it had been disclosed that he had stage III prostate cancer, the additional statement about a metastatic brain lesion did not

further prejudice the defendant, the court disagrees. While stage III prostate cancer is a serious condition, adding a metastatic brain lesion makes it significantly more serious.

The record here also establishes that Radecki gave the false testimony with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. Whether Radecki was only somewhat concerned during the period ending on November 6, 2008 about a possibility that he might have a brain tumor, or Radecki thought during that period that he "probably had a brain tumor," is immaterial. (Radecki Dep. 550:11, June 19, 2009.) Under either scenario, once Radecki learned on November 6 that there was no evidence of metastatic disease to the brain, he had to have been greatly relieved. Every indication is that this was a memorable piece of news for the plaintiff and that he would remember the difference between learning that he did not have a metastatic brain lesion and that he had one. Based on a review of the record, the court cannot conclude that his false testimony was the result of confusion, mistake, or faulty memory.[1] In addition, the fact that Radecki changed the tense of his statement from "had" to "have" suggests that he had willful intent to provide false testimony because the

---

[1] Prior to a review of the record, the court's inclination was to give the plaintiff the benefit of the doubt on the question of perjury, as the court informed the parties on the afternoon of May 8, 2009. (See Trial Tr. Vol. II, 237-38, May 8, 2009.)

change conveyed to the jury not just that he had been suffering from a metastatic brain lesion at the time he was not looking for work in late 2008 but also that he would be continuing to suffer from a metastatic brain lesion.  At that point, Radecki knew that no one else in the courtroom, not even his own attorney, had any information to the contrary.  Finally, once it became apparent during argument on the motion for a mistrial that the plaintiff would be required to provide his medical records to the defense, Radecki spoke to his attorney, who then reported to the court that "[t]he brain issue is not an issue -- what showed up on the imaging had not progressed, didn't warrant treatment" and that Radecki is "apparently clear now."  (Trial Tr. Vol. II, 213, May 8, 2009.)  Looking at Radecki's conduct in context, the court construes this statement to be an effort to avoid the requirement of producing the medical records.  In addition, the statement was materially misleading in that it suggested that what showed up on the imaging was something that could have progressed into a metastatic brain lesion.  The statement was also materially misleading in that it failed to acknowledge that since November 6, 2008 Radecki had known that there was no evidence of metastatic disease to the brain.

   For these reasons, the court concluded that the plaintiff willfully provided false testimony for the improper purpose of causing the jury to feel sympathy for him.

**B.     Most Appropriate Sanction**

In determining what sanction is most appropriate, the court found it helpful to review decisions in other cases where a party committed perjury or engaged in substantially similar conduct. In Campos v. Correction Officer Smith, 418 F. Supp. 2d 277, 279 (W.D.N.Y. 2006), the pro se plaintiff "knowingly submitted a falsified exhibit in an attempt to rebut [the] defendants' contention that he never appealed [a] grievance" and thus his complaint should be dismissed for failure to exhaust administrative remedies. The court concluded that "[a] plaintiff's knowing presentation of a falsified document to a court is sufficient grounds for dismissal of his complaint." Id. In Combs v. Rockwell International Corp., 927 F.2d 486, 488 (9th Cir. 1991), "Combs authorized [his] counsel to alter his deposition in material respects. He signed the revised deposition and swore, under penalty of perjury, that he had reviewed the transcript and had himself made the changes." The court concluded that "[d]ismissal is an appropriate sanction for falsifying a deposition." Id. In Dotson v. Bravo, 202 F.R.D. 559 (N.D. Ill. 2001), the plaintiff used a false name in his deposition and in answers to interrogatories. The court concluded that dismissal with prejudice was appropriate in response to the plaintiff's "deliberate and persistent failure to identify himself and for engaging in a pattern of obstructive

discovery tactics designed and intended to impair and inhibit defendants' discovery of his identity and arrest history." Id. at 576.

In Knapp v. Convergys Corp., 209 F.R.D. 439, 442 (E.D. Mo. 2002), the court "found by clear and convincing evidence that Plaintiff gave perjurious answers in her interrogatories and during her deposition." The court concluded that dismissing the plaintiff's case was "the appropriate sanction for her deliberate and continued abuse of the discovery process." Id. In Martin v. DaimlerChrysler Corp., 251 F.3d 691, 695 (8th Cir. 2001), the plaintiff also "gave perjurious answers during her deposition and in her interrogatory responses." The court concluded that the trial court "did not abuse its discretion in dismissing the [plaintiff's] suit as a sanction for her repeated perjury." Id. In Pope v. Federal Express Corp., 974 F.2d 982 (8th Cir. 1992), Pope and her lawyer knowingly presented a falsified document and Pope lied during her deposition when testifying about the document. The court held:

> Dismissal of Pope's lawsuit is a severe sanction, yet under the circumstances we cannot find that such a sanction constitutes an abuse of the district court's discretion. The dismissal of Pope's suit was based on the district court's finding that manufactured evidence and perjured testimony had been introduced in an attempt to enhance the case through fraudulent conduct. When a litigant's conduct abuses the judicial process, the Supreme Court has recognized dismissal of a lawsuit to be a remedy within the inherent power of the court. Chambers v. NASCO, Inc., 501 U.S. 32, ----, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991).

-13-

Id. at 984.

By contrast, in Bower v. Weisman, 674 F. Supp. 109 (S.D.N.Y. 1987), the plaintiff gave false testimony during her deposition. When examination of another witness revealed that the plaintiff had testified falsely, the plaintiff served an affidavit on the defendant changing her answers and subsequently testified truthfully at a follow-up deposition ordered by the court. The court concluded that a sanction of dismissal was not appropriate because "Bower had already testified as to having sexual relations with others than Weisman during the time period at issue. The belated addition of three more affairs--while very serious due to the fact of the perjury itself--has little effect on the merits of action . . . ." Id. at 112. In addition, the court concluded that the defendant had not been prejudiced because there had been sufficient time for him to conduct additional discovery and prepare for trial. However, the court concluded that a sanction in the form of the costs and fees the defendant had been required to expend because of the plaintiff's perjury was the appropriate sanction.

In Kravetz v. U.S. Trust Co., 941 F. Supp. 1295 (D. Mass. 1996), the court declined to dismiss the plaintiffs' case because the defendants failed to demonstrate by clear and convincing evidence that the plaintiffs "committed perjury, fabricated evidence, or perpetrated some other 'unconscionable scheme.'"

-14-

Id. at 1301.  In Rybner v. Cannon Design, Inc., No. 95 Civ. 0279 (SS), 1996 WL 470668 (S.D.N.Y. Aug. 20, 1996), the plaintiff testified falsely during his deposition.  Two and a half weeks after the deposition, his counsel disclosed to the defense that the plaintiff had "made certain misstatements with respect to his previous employment during his deposition."  Id., at *2.  Rybner was deposed for a second time the following month and at that time admitted that he knew during his first deposition that he was testifying falsely.  The court concluded that Rybner's conduct was not sufficiently egregious to warrant a sanction of dismissal and imposed a sanction in the form of costs and fees associated with conducting the first and second deposition; the court also stated that it would permit the defendants to inform the jury of Rybner's dishonesty and the court would give a jury charge that "any falsehood under oath should be considered seriously by jurors in assessing [Rybner's] credibility."  Id. at *6.

   None of these cases involved perjury during a trial, which is the situation here.  However, in ABF Freight System, Inc. v. NLRB, 510 U.S. 317 (1994), an employee gave false testimony under oath before an administrative law judge ("ALJ").  The Court concluded that the National Labor Relations Board did not abuse its discretion in declining to adopt a rigid rule precluding reinstatement when a former employee gives false testimony before

an ALJ.  Key to the Court's holding was its view that "[w]hen Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency's decision controlling weight unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" Id. at 324.  The Court's views on false testimony were quite clear.  The court stated that "[f]alse testimony in a formal proceeding is intolerable."  Id. at 323.

> In any proceeding, whether judicial or administrative, deliberate falsehoods "well may affect the dearest concerns of the parties before a tribunal," United States v. Norris, 300 U.S. 564, 574, 57 S.Ct. 535, 539, 81 L.Ed. 808 (1937), and may put the factfinder and parties "to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross examination, by extraneous investigation or other collateral means." Ibid. Perjury should be severely sanctioned in appropriate cases.

Id.  In a concurring opinion, Justice Scalia observed that "[t]he principle that a perjurer should not be rewarded with a judgment--even a judgment otherwise deserved--where there is discretion to deny it, has a long and sensible tradition in the common law."  Id. at 329.

After reviewing the authorities discussed above, the court advised counsel during oral argument on the instant motion that it had concluded that the appropriate sanction in this case was either a sanction of dismissal or a sanction in the form of an award to the defendant of its costs and fees associated with the mistrial and the instant motion.  The imposition of either

-16-

sanction in response to perjury is a remedy within the inherent power of the court.  Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991).  No lesser sanction would constitute an adequate statement as to the seriousness of the effect of the plaintiff's misconduct on the adjudicative process in this case and provide adequate protection for the integrity of trial proceedings by deterring others who might be tempted to engage in such misconduct.  In considering the cases where a sanction in the form of costs and expenses was imposed, the court places weight on the fact that those cases did not involve perjury in a formal proceeding, i.e., the context in which such strong language was used by the Supreme Court in ABF Freight System.  Bower and Rybner both involved perjury during a deposition, and in each case, the perjury was disclosed before trial by counsel for the person who gave the perjurious testimony--albeit not until it was apparent that the perjury was about to be uncovered.  Radecki had an opportunity to make an accurate voluntary disclosure, but instead made one that was misleading.  In Bower, the court concluded that the perjury had little effect on the merits, and in both cases, the perjury occurred sufficiently in advance of the trial on the merits so that the opposing party had sufficient time to be prepared for trial with the benefit of truthful testimony.  Here, it appears that the perjury would have had a material effect on the trial, and because the perjury occurred at

trial, there was no time for the opposing party to prepare for trial with the benefit of truthful testimony.  While most of the cases discussed above involved repeated acts of perjury or other dishonesty, none involved perjury at trial, which is a situation where the opposing party is put at a greater disadvantage.[2]  If the perjury is discovered at trial, there is little or no time to investigate or prepare to attack it; if the perjury does not come to light until after the trial, the opposing party must satisfy the requirements of Federal Rule of Civil Procedure 60(b) or (d) to get any relief it desires.[3]

In addition, as the Court stated in ABF Freight System, [f]alse testimony in a formal proceeding is intolerable."  ABF Freight Sys., 510 U.S. at 323.  To have the plaintiff in this case pay a monetary penalty and then return to court and present

---

[2]As the court discussed with counsel, in a case being tried to a jury, the determination as to whether a witness is telling the truth is to be made by the jury.  Thus, the court would not have been receptive to a motion for a sanction of dismissal during a trial on the ground that a witness was committing perjury.  Here, however, the motion for a mistrial was made on the basis of unfair prejudice and with a belief that the plaintiff's testimony was true.  The motion for a mistrial was granted because the court concluded it was not possible to give the jury an appropriate curative instruction.  The motion for a sanction based on the plaintiff's perjury has been considered only once there is no case being presented to a jury.

[3] See, e.g., Hazel-Atlas Glass Co. v. Hart-Ford-Empire Co., 322 U.S. 238 (1944), overruled on other grounds, Standard Oil Co. v. United States, 429 U.S. 17 (1976); Gleason v. Jandrucko, 860 F.2d 556 (2d Cir. 1988); Kupferman v. Consol. Research & Mfg. Corp., 459 F.2d 1072 (2d Cir. 1972).

his case before a new jury would give the appearance of tolerating "a 'flagrant affront' to the truth-seeking function of adversary proceedings," id., even if (or perhaps especially if) the court allowed the defendant to use the plaintiff's perjurious testimony from the first trial to attack his credibility. Therefore, the court concludes that the most appropriate sanction in this case is a sanction of dismissal with prejudice.

The defendant moved in the alternative for a sanction of dismissal with prejudice or a sanction in the form of an award of costs and fees associated with the mistrial in this action and the instant motion.  Therefore, no award of costs and fees is being made.  In any event, it appears to the court that an award of a sanction of dismissal accompanied by an award of costs and fees would be too severe a sanction under the circumstances of this case, where it appears the defense has expended no more time and money than it would have expended had the case proceeded to verdict and the jury's verdict been in favor of the defendant.

## III. CONCLUSION

For the reasons set forth above, the defendant's Motion to Dismiss with Prejudice and for Costs and Fees (Doc. No. 53) is hereby GRANTED in part and DENIED in part.  The plaintiff's case is hereby dismissed with prejudice.  No award of costs and fees is being made.

The Clerk shall enter judgment and close this case.

It is so ordered.

Signed this 21st day of August, 2009 at Hartford, Connecticut.

                                                    /s/AWT
                                    Alvin W. Thompson
                           United States District Judge